(46 South. 38.)

No. 16,553.

CHAUVIN et al. v. LOUISIANA OYSTER COMMISSION et al.

(Nov. 18, 1907.  On Rehearing, March 30, 1908.)

1. PUBLIC LANDS—PATENT FROM STATE—COLLATERAL ATTACK.

Neither the state nor any of its agents can attack a state patent valid on its face in a collateral proceeding.

2. SAME—SWAMP AND OVERFLOWED LANDS.

The acceptance by the state of lands certified to it by the Secretary of the Interior as "swamp and overflowed" is conclusive upon the state as to the title to and character of the lands so certified and subsequently sold by the state as such.

### On Rehearing.

3. STATES—STATE BOARDS—AUTHORITY.

Whilst the authority of a public corporation, created as an agent of the state, may be very extensive in the direction in which it is intended to be used, such agent has not only less authority in other directions than the ordinary citizen, but has none whatever; and the authority conferred upon it can be sustained only in so far as not devested or controlled by authority emanating from the same or a higher source.

4. PUBLIC LANDS—SALE OF STATE LANDS—OYSTER COMMISSION—POWERS.

The state, through its agents, having sold a particular tract of land as susceptible of private ownership, the oyster commission, another agent, charged with the control of oyster beds and water bottoms suitable for oyster beds, has no authority or standing in court to deny · or attack the validity of such sale.

5. SAME—RIGHT TO BRING ACTION.

In a litigation between a possessor of land, holding under a patent from the state, and the oyster commission, the latter being without capacity to stand in judgment for the state with respect to the validity of such patent, and the state itself not being a party to the litigation, no judgment can be rendered on that question by which the state can be bound.

(Syllabus by the Court.)

Appeal from Twentieth Judicial District Court, Parish of Terrebonne; Louis P. Caillouet, Judge.

Action by Charles L. Chauvin and others against the Louisiana Oyster Commission and others. Judgment for plaintiffs, and defendants appeal. Affirmed.

Robert Emmet Hingle, for appellant Oyster Commission. Walter Guion, Atty. Gen., for appellants state of Louisiana and Oyster Commission. Suthon & Wurzlow (John Dymond, Jr., and Hugh Connell Cage, of counsel), for appellees.

LAND, J. The plaintiffs, as owners of section 42, township 21, in the parish of Terrebonne, by a regular chain of title derived from the United States, through state of Louisiana, enjoined the defendants from trespassing on any part of said section, and from leasing or attempting to lease any submerged lands situated within the boundaries of said section for fisheries or any other purpose.

It appears that said section embraces within its lines a part of the water and bed of Bay Crocodile. The answer of the defendant commission is in effect: That the said bay is a part of the waters of the state of Louisiana, which belong to her by virtue of her sovereignty, and not by any grant from the United States; that no power has ever been given by the state to any of her officers to alienate such water bottoms; that the portion of the bay aforesaid claimed by the plaintiffs is a part of the waters of the state, to which she had title from the date of her admission into the Union; and that plaintiffs

have no right, title, or ownership therein.

Plaintiffs' chain of title is not disputed, and it appears therefrom that the whole of township 21 south, of range 18 east, was surveyed in 1831, and subsequently selected, approved, and patented to the state as swamp and overflowed land under the swamp land grants of 1849 and 1850; that in 1876 the state sold section 42 in said township to J. W. Board, one of the authors of the defendants' title.

On plaintiffs' plea of estoppel the district judge ruled that evidence was not admissible to show that the land was not swamp or overflowed land, or land subject to tidal overflow, within the meaning of the acts of Congress and as found by the Secretary of the Interior in the exercise of an express jurisdiction conferred on him by law, and that the acts and patents of the two governments in the premises could not be attacked collaterally by an agent of the state, which accepted title to the lands as swamp and overflowed.

The court, however, under limitations, admitted evidence relating to the condition of the locus in quo, which "showed beyond the peradventure of a doubt that the lot or section 42, claimed by the plaintiffs, fronted on Bayou Little Caillou, and crossed Bay Crocodile, having a piece of land on the west side of this bay and another piece on the east side. The evidence further showed that this Bay Crocodile was a salt-water bay, connecting through Bayou East and Bayou West, Bay Welch, and Cat Island Lake, with the Gulf of Mexico; that the same was salt water varying in depth from 1 to 5 feet, and subject to the regular ebb and flow of the tide. The evidence further showed that this bay was about 2½ miles long, and approximately three-quarters of a mile wide, and that the same had been practically as it is to-day "since the memory of man runneth not to the contrary."

After hearing the evidence, the court in

a very able and elaborate opinion held that the defendant commission, a mere agency of the state, could not collaterally attack the title derived by the plaintiffs from the state, which as grantor was estopped to assert that at the time of the conveyance it had no title, or that none passed by the deed; citing 16 Cyc. 685, 686, and notes. In support of the doctrine that estoppel applies to the state, the judge cited State of La. v. Taylor, 28 La. Ann. 460–462, State v. Vicksburg Railroad, 44 La. Ann. 981, 11 South. 865, and State v. Ober, 34 La. Ann. 359.

We assume that this doctrine is not controverted. The judge cited the following authorities in support of the principle that a party in possession of real estate under a recorded title ostensibly valid cannot be disturbed by collateral proceedings instituted for the purpose of invalidating his title: Doherty v. Leake, 24 La. Ann. 224; Anderson v. Carroll, Hoy & Co., 23 La. Ann. 175; Lannes v. Workingmen's Bank, 29 La. Ann. 113.

Pretermitting the question of estoppel, the judge held that the registrar of the state land office was authorized to sell swamp and overflowed lands subject to tidal overflow. Section 3 of Act No. 104 of 1871, p. 244. He further held that Crocodile Bay was not a navigable highway leading into the Gulf of Mexico, and that, even if it were, the state had the right to sell the submerged portion thereof, subject only to the right of navigation by the public.

There was judgment in favor of the plaintiffs, and the defendants have appealed.

In Smith v. Crandall, 118 La. 1052, 43 South. 699, this court held that a state patent conveys the legal title to the patentee, and cannot be revoked or set aside, except on judicial proceedings instituted in behalf of the sovereign.

The entry of public land, valid upon its face, segregates the tract of land from the public domain. McMichael v. Murphy, 197

U. S. 304, 25 Sup. Ct. 460, 49 L. Ed. 766. It follows that the patent must be annulled by direct action before the title can be devested and the land in question restored to the public domain of the state of Louisiana.

In the case at bar the Oyster Commission, by leasing out a part of the tract of land covered by plaintiffs' patent to the codefendant, has treated the title emanating from its creator, the state, as an absolute nullity, worthy of no consideration whatever. In 1906 the state by section 10 of Act No. 178, p. 323, excepted from the jurisdiction of the Oyster Commission water bottoms claimed under some title by any person, firm, or corporation, "until there shall have been an adjudication by a court of competent jurisdiction between the state and claimant as to the validity of the title to the property." It is true by a proviso the section is declared not applicable to any property the title to which was then in litigation; but all the same the lawmakers recognized by this enactment that the proper procedure was for the sovereign to go into court and to assail by direct action adverse titles to the water bottoms suitable for oyster production and cultivation. The present suit was pending when said act was adopted.

The land in dispute was surveyed in 1831, the survey was approved in 1832, and it was selected as swamp and overflowed land and patented as such to the state of Louisiana in 1856. For more than half a century the United States and the state of Louisiana have acquiesced in the title so conveyed, and more than 30 years ago the state patented the property to the author of plaintiffs' title.

At this late day the Oyster Commission, a mere agent of the state of Louisiana, assails all of the acts of the officials of the two sovereigns and the patents issued by them as absolute nullities on the novel ground that a portion of the tract conveyed consisted of

a tidal water bottom; that, such portion not being land, the officials of the two governments were without jurisdiction in the premises.

The answers to this contention are: (1) That neither the state nor any of its agents can attack its solemn patent, valid on its face, in a collateral proceeding; and (2) that the acceptance by the state of lands certified to it by the Secretary of the Interior is conclusive upon the state as to the title to and the character of such lands. Roger's Locomotive Machine Works v. American Emigrant Co., 164 U. S. 559, 17 Sup. Ct. 188, 41 L. Ed. 552; V., S. & P. R. R. Co. v. Tibbs, 112 La. 51, 36 South. 223. The state being estopped to deny that the tract in dispute is "swamp and overflowed" lands, evidence to prove the contrary was inadmissible.

Judgment affirmed.

BREAUX, C. J., and NICHOLLS, J., concur in the decree.

### On Rehearing.

MONROE, J. Section 2 of the act of Congress approved September 28, 1850 (9 Stat. 519, c. 84), provides that:

"It shall be the duty of the Secretary of the Interior, as soon as may be practicable after the passage of this act, to make out an accurate list and plats of the lands described as aforesaid ["the whole of those swamp and overflowed lands, made unfit thereby for cultivation, which shall remain unsold at the passage of this act" (section 1)] and transmit the same to the Governor of the state; * * * and, at the request of the Governor, cause a patent to be issued to the state therefor; and, on that patent, the fee simple of said lands shall vest in the state, * * * subject to the disposal of the Legislature thereof," etc.

It is conceded that the Secretary of the Interior transmitted to the Governor the lists and plats as contemplated by the statute quoted, and that among the tracts so listed was the section 42 here in dispute, which in 1831 had been surveyed and returned as swamp or overflowed land by an of-ficer employed by the government of the United States to make the survey. The state of Louisiana was not obliged to accept, under the title tendered, all or any part of the lands included in the list, and when, on October 7, 1851, section 42 was selected, among others which were listed, it is to be presumed that the selection was made with due regard to the state's rights. At all events the land was selected by the state, acting through its designated representative, as swamp or overflowed land, and the transfer of the title thereto from the United States was effected on August 1, 1854, by the approval of the Secretary of the Interior, acting under the authority of the act of Congress above referred to. Thereafter, in 1855, the General Assembly of Louisiana created the office of "register," and authorized the incumbent to sell warrants to be located on the lands so acquired, as also on any shallow lakes which might have become the property of the state, might have been surveyed, were susceptible of being reclaimed, wholly or in part, and were not navigable; "the warrants to be issued for not more than 640, nor less than 40, acres," and no lands to be sold for less than $1.25 an acre (Rev. St. §§ 2916, 2920, 2929). It was further provided (Rev. St. § 2930) that:

"The register of the state land office shall preserve maps or plats of all swamp lands donated to Louisiana, certified to by the surveyor general, and shall mark thereon, on each tract of land purchased, the number of the certificate issued therefor, and shall keep a well-bound book in his office, in which shall be entered, in proper form, all the lands thus sold, to whom sold, and for what price, which book and map shall be carefully preserved and shall be deemed official records."

The foregoing provision was re-enacted in Act No. 38, p. 91, of 1870 (extra session), which further provided (section 14):

"That the public lands, donated by Congress * * * which are subject to regular tidal overflow, designated as 'swamp and overflowed lands,' within the intent of the several acts of Congress relating thereto, which have been ap-

proved to the state of Louisiana by the general government as swamp and overflowed lands, shall be subject to entry at the rate of twenty-five cents per acre. Provided, that satisfactory proof be filed with the register * * * that any land sought to be purchased under the provisions of this section is subject to regular tidal overflow."

The act also provided (section 15):

"That it shall be the duty of the Governor, when applied to, to issue patents for all lands that have been sold, and for lands located by warrants, whenever he shall be satisfied that the same have been legally sold or located."

This was followed by Act No. 104, p. 243, of 1871, which (among other things) provides (section 1):

"That the lands donated by Congress * * * as swamp and overflowed lands, * * * which shall have been surveyed and approved in accordance with law, shall be subject to entry and sale at the price of twelve and a half cents an acre" to persons "acquiring for actual settlement and cultivation."

Otherwise (section 2) the price to be $1.25 an acre; and no purchaser, in either case, to be allowed to enter more than 160 acres. Section 3 of this act provides that lands subject to tidal overflow, so as to be unfit for settlement and cultivation, may be sold for 25 cents an acre—

"provided satisfactory proof be filed with the register * * * that any land sought to be purchased under this section is subject to tidal overflow so as to be unfit for settlement and cultivation."

In November, 1876, J. W. Board, a resident of the parish of Terrebonne, presumably upon the faith of the record and of the law (showing that it had been selected by the state, transferred by the United States, and accepted and offered for sale by the state, as swamp or overflowed land), bought the tract herein in question, at the office established by the state for the sale of such lands, from the officer authorized to make the sale, and obtained a patent therefor, issued in the name of the state, by the Governor; and thereafter the title so acquired passed by mesne conveyances to the plaintiffs herein,

who complain that, notwithstanding that they and their authors hold, and have held, under a title from the state, and have enjoyed undisturbed possession, as owners, for more than 30 years, the defendants, "the Oyster Commission of Louisiana" and "the Oyster Company, Limited" (a private corporation), are attempting to dispossess them, and will actually occupy a portion of their property unless prohibited by injunction.

The first legislation enacted for the promotion of the oyster industry appears to have been Act No. 106, p. 195, of 1886, which provided (inter alia):

"Section 1. * * * That all beds of rivers, bayous, creeks, lakes, coves, inlets and sea marshes, bordering on the Gulf of Mexico, within the jurisdiction of this state, *and not heretofore sold or conveyed by special grants or by sale, by this state or by the United States, to any private party or parties,* shall continue and remain the property of the state of Louisiana," etc. (Italics by the court.)

"Sec. 2. * * * That, if any river, bay, lake, bayou, cove, inlet, or pass, makes into, or runs through, the land of any person, and is comprised within the limits of his lawful survey, such person, or other lawful occupant, shall have the exclusive right to use said bodies of water for planting oysters and other shellfish, but the right of the owners or occupants of land on any of the other shores, bays, rivers and bayous * * * shall extend to ordinary low-water mark; but it is not intended thereby to deprive them of the privilege extended to others by the first section of this act" (which provides for the use of the beds of the rivers, bayous, etc., as "common").

While the act thus quoted was in force, to wit, on August 30, 1886, the property herein dispute was sold by William Wright (who had acquired by mesne conveyance from the patentee) to J. P. Viguerie, who in 1887 sold it to Mrs. Faisans. By Act No. 110, p. 142, of 1892, it was provided:

"That all the beds of the rivers, bayous, creeks, * * * shall continue and remain the property of the state," etc. (the reservation in favor of prior purchasers, as contained in the act of 1886, being omitted).

And Act No. 121, p. 170, of 1896, contains a similar provision.

By Acts No. 153, p. 274, of 1902, No. 52,

p. 113, of 1904, and No. 178, p. 317, of 1906, the Oyster Commission was created and vested with wide authority, and (quoting from the act of 1904) it was provided:

"That all the beds and bottoms of the rivers, bayous, lagoons, lakes, bays, sounds and inlets, bordering on, or connected with, the Gulf of Mexico, and all that part of the Gulf of Mexico within the jurisdiction of the state of Louisiana, and all oysters and other shellfish naturally growing thereon, shall be, continue, and remain, the property of the state of Louisiana, and shall be under the control of the Oyster Commission of Louisiana," etc.

It will be seen from the foregoing that in 1851 the state, through its authorized representative, selected the tract in dispute as swamp and overflowed land, the title to which was vested in the United States, and as such in 1854 accepted the title thereto tendered by the United States, under a law which contemplated that the land, or the proceeds, should be devoted to "reclaiming said lands by means of levees and drains"; that in 1876 the state, also through its agents specially authorized, sold said tract as land which was susceptible of private ownership, and received and appropriated the price paid therefor by the purchaser; that 10 years later it in effect confirmed the title so conveyed by an act which, in providing for the future reservation of territory suitable for the cultivation of oysters, in express terms excluded from its operation such bedding grounds as had already been sold to private individuals, which act remained in force for some six years, during which period the more immediate authors of the plaintiffs acquired their title to the land so excluded; and now, more than 20 years after the action of the one agent in issuing the state's patent for the land in question had been ratified by a legislative enactment, another agent of the state comes forward to say that the patent is of no value, that the agent by whom it was issued exceeded his authority, that the common right of fishing, or bedding, oysters, within the ebb and flow of the tide, is in-

alienable, and that the state is not, and cannot be, estopped by any patent issued in derogation of such right.

The grant under which the Oyster Commission exercises its powers does not, however, authorize it to speak for the state for the purpose of denying the authority of the state and of attacking as invalid and ultra vires the contracts heretofore made by the state, or in its behalf by other agents specially authorized for that purpose. The commission is a mere creature of legislative enactment, and, whilst its powers are very extensive in the direction in which it is intended to operate, it has not only less authority in other directions than the ordinary citizen, but has none whatever. It is true that it is charged with the administration and control of the beds of all rivers, bayous, lagoons, etc., adjacent to the Gulf of Mexico, and its authority in that respect should be sustained up to the point where it is devested or controlled by authority emanating from the same or a higher source.

The authority exhibited by plaintiffs for holding possession of the property purchased by them is, however, derived from the same source as that by virtue of which the commission seeks to dispossess them, and is in the form of a contract, to which the creator of the commission is a party, and with respect to the validity of which the commission is not authorized to stand in judgment; and what the commission itself cannot do the other defendant, claiming under the commission, cannot do. This view is confirmed by section 10 of Act No. 178, p. 323, of 1906 (enacted after this suit was begun), which provides:

"That the said commission shall have power to lease any water bottoms in the state, * * * as described in section 1 of this act, and the title whereof is vested in the state and is not claimed under some title by any person; and no lease of any bottom which may be claimed by any private individual, firm, or corporation shall be valid or have any effect until there shall have been an adjudication by a court of

competent jurisdiction between the state and the claimant as to the validity of the title of the property to be leased: Provided, that they (sic) shall not apply to any property that has not heretofore been alienated by the state or the title to which is now in litigation, and desirable for the purposes of bedding, planting and cultivating, or propagating, oysters."

The proviso, "that they (?) shall not apply to any property * * * the title to which is now in litigation," proceeds upon the assumption that the state was, or might make itself, a party to the litigation referred to, and is merely intended to withdraw from the preceding denunciation of nullity leases by the commission of property the title to which may be thus at issue.

It follows, however, that as neither of the defendants now before the court is authorized to stand in judgment for the state, quoad the validity of the title set up by plaintiffs, the state cannot be bound with respect thereto by any judgment which may be herein rendered, and that, as between the plaintiffs and the state, such judgment must leave that question entirely at large.

It is therefore, and for the reasons hereinabove stated, ordered, adjudged, and decreed that the decree heretofore entered in this case, affirming the judgment appealed from, be reinstated and now made final.